# FRANKLIN, GRINGER & COHEN, P.C.

**ATTORNEYS AT LAW**

GLENN J. FRANKLIN
MARTIN GRINGER
STEVEN ELLIOT COHEN
JOSHUA A. MARCUS*
MICHAEL S. MOSSCROP
A EDWARD MAJOR†

BRIAN G. KLEIN*
JASMINE Y. PATEL*

*ADMITTED IN NY AND NJ
†ADMITTED IN NY, NJ, FL, ENGLAND AND WALES

666 OLD COUNTRY ROAD, SUITE 202
GARDEN CITY, NEW YORK 11530-2013
TELEPHONE (516) 228-3131 • FAX (516) 228-3136
NEW YORK CITY TELEPHONE (212) 725-3131 • FAX (212) 725-3268

KEN SUTAK
OF COUNSEL

NEW YORK CITY OFFICE
150 EAST 58TH ST., 27TH FL.
NEW YORK, NY 10155
DIRECT ALL CORRESPONDENCE
TO GARDEN CITY OFFICE

November 17, 2014

**VIA ECF**
The Honorable Magistrate Judge A. Kathleen Tomlinson
U.S. District Court Eastern District of New York
Long Island Courthouse
100 Federal Plaza
Central Islip, NY 11722

> Re:  Miguel Angel Coronel Martinez v. Ayken, Inc., et ano.,
>      Index No.: 13-7411 (LDW)(AKT)

Dear Magistrate Judge Tomlinson:

My office represents Defendants in the above-referenced matter.  I am writing regarding Plaintiffs' outstanding motion for conditional certification pursuant to the Fair Labor Standards Act (hereinafter the "FLSA").  We wish to bring to your attention that during the deposition of Plaintiff Jessica Camarda, Camarda's testimony undermined several of the allegations set forth in her prior Declaration in support of her motion for collective certification.  Accordingly, Defendants believe the Court should be aware of such information prior to issuing its decision relating to collective certification pursuant to the FLSA.  In the alternative, should collective certification be granted, Defendants will seek a pre-motion conference for a motion to decertify any putative class pursuant to the FLSA.

As an initial matter, Plaintiff Camarda testified that she only worked as a server at Trodos Westbury. Ex. B, pp. 9.  She also asserted that she was employed from December 2011 to May 2012 even though her employment records show she was employed from March 2011 to September 2011. Ex. B, p. 81; See Affidavit of Ayhan Hassan, dated May 6, 2014, Ex. E. Camarda testified that when she was hired she understood that she would receive tips in addition to her pay. Ex. B, p. 12.  She acknowledged that she would punch in when she started her shift and punch out when she ended her shift. Ex. B, pp. 16-7.  Her main complaint is that four months into her employment, a new manager at the restaurant, "Emin," replaced her former manager, Juan Cerrtios, and she alleges that "Emin" clocked her out early approximately ten times. See Ex. B, pp. 19-20, 47-8.  She also asserts that when Emin became a Manager, he reduced the number of days she worked from six to four days. See Ex. B, p. 36.  Camarda also asserted that she was incorrectly paid $4.00 an hour even though she admitted her paystubs showed that she was paid $5.00 an hour. Ex. B, pp. 49-50.  Camarda was unable to give any

1

FRANKLIN, GRINGER & COHEN, P.C.
ATTORNEYS AT LAW

credible explanation as to how she was paid $4.00 an hour.  *Id.*

Notably, during her deposition Camarda claimed that she initially worked six days a week and worked from 4 P.M. until 9 or 10 P.M. on the weekdays and 4 to 11 P.M. on Saturdays and 10 A.M. until 4 P.M. on Sundays. Ex. B, pp. 15, 24-7, 42. Taking Camarda's testimony at face value, she never worked over 40 hours in a week as the most hours in a week she would have worked is 37 hours a week. This, incidentally, is similar to Defendants' time records, which show she did not work over forty hours a week.

In her Declaration, Plaintiff Camarda asserted that based upon "conversations with other employees transferred to the restaurant he worked" she was informed by such workers that:

1)    "Defendants instituted the same tip compensation policy to all tipped employees at each of the nine restaurants . . . ."

2)    "[O]ther tipped employees at the Ayhan Restaurant were required to work for the same or similar hours."

3)    "Other tipped employees at the Ayhan Restaurants were also compensated at the base hourly rates below the prevailing minimum wage, and also routinely worked for more than ten hours a day."

4)    "Other tipped employees, including but not limited to the tipped employees named in Paragraph 1 herein similarly worked in excess of 40 hours per week and were paid similar incorrect rates for the relevant time periods."[1]

See Ex. A, ¶¶ 2-6. Yet, during her deposition, Camarda testified that her conversations with other employees differed from the conversations asserted by Camarda in her Declaration. Camarda claimed that she spoke to four employees about their pay, Melinda Lee, Melissa Missone, and her initial Manager, Juan Cerritos. See Ex. A, ¶ 1; Ex. B, pp. 68-72. Camarda claims that she spoke to Melinda Lee, who she claims complained to her about having her hours cut and that they were all underpaid by being paid $4.00 an hour. Exhibit B, pp. 68-70. Yet, Camarda acknowledged that she did not know if Ms. Lee worked over 40 hours a week. Ex. B, p. 71. Camarda also has no knowledge if Ms. Lee was ever punched out early by her manager. *Id.* Camarda also claimed that she spoke with Melissa Missone. Yet, her actual conversation with Ms. Missone was that they believed they were underpaid. Ex. B, p. 70. Yet, Camarda acknowledged that she did not know if Missone worked over forty hours a week. Ex. B, pp. 70-1. Camarda also acknowledged that Missone never told her that her manager punched her out of work early. Ex. B, p. 70. Camarda also claims she spoke with another employee, Diana who merely told her she felt she was underpaid and mistreated. *Id.* Yet, Camarda testified that Diana never told her she worked over forty hours. Ex. B, pp. 71-2.

In regards to Camarda's testimony regarding off-the-clock work, Camarda has not identified any other employees at Trodos who were subjected to the same policy, let alone any

---

[1]    Defendants note that these allegations are identical to the allegations contained in the Declaration of Plaintiff Miguel Angel Coronel Martinez, whose Declaration also contains numerous false statements.

employee at any other restaurant who was subjected to the same policy.

Moreover, Plaintiff's claim that she and others were paid $4.00 per hour is bizarre and should not be given any credence as even Plaintiff acknowledges her pay records reflected that she was paid $5.00 an hour.  Similarly, since Ms. Camarda was never paid overtime and she did not testify that she received any knowledge about other employees overtime pay or even if they worked overtime, her assertion that she received $7.50 for overtime is false.  Ex. A ¶ 6. Further, Camarda's schedule never included working over ten hours a day.  See Ex. B, pp. 15, 24-7, 42.  Nor is there any evidence that she had any discussions with employees at other Ayhan's restaurants about tip pooling at such locations.  In fact, at Camarda's deposition, Plaintiffs' attorney withdrew the tip-pooling claim.  See Ex. B, pp. 13, 49.

Finally, Camarda did testify that she spent more than twenty percent of her time doing side work such as cleaning.  While Defendants deny such allegations, Defendants note that even if Camarda's allegations were believed, given that Plaintiff Martinez testified that waiters never cleaned at his restaurant, there cannot be a general policy of requiring servers to clean at all of the restaurants.  See Ex. C, pp. 85-6.

Accordingly, Defendants believe that the Court should consider Camarda's testimony which shows that Camarda's affidavit incorrectly asserted knowledge of practices at other Ayhan's restaurants to which Camarda testified she had no knowledge.  Accordingly, Defendants believe such information should be considered by the Court, and/or Defendants should be given the opportunity to make a motion for decertification should the Court grant collective certification.

Respectfully submitted,

FRANKLIN, GRINGER & COHEN, P.C.

Joshua Marcus

cc:    C.K. Lee, Esq. (via ECF & e-mail)

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

MIGUEL ANGEL CORONEL MARTINEZ, et al,
*on behalf of themselves, FLSA Collective Plaintiffs
and the Class,*

                                        **Plaintiffs,**

                  -against-

AYKEN, INC. d/b/a AYHAN'S FISH
KEBAB, et al,
                                   **Defendants.**

----------------------------------------------------------X

13 CV 7411

## DECLARATION OF JESSICA CAMARDA

I, JESSICA CAMARDA, under penalty of perjury, affirm as follows:

1.    I was employed by Defendants as a waitress from December 2011 until May 2012, at Defendants' restaurant "Ayhan's Shish Kebab" located at 477 Old Country Road, Westbury, New York 11590. At all times during my employment by Defendants, I was a tipped employee. While employed by the Defendants as a waitress, I observed that other tipped employees employed by Defendants did work that was the same or similar to the work I did including, but not limited to, Melinda Lee (server), Melissa Masona (server) and Juan Cerritos (server).

2.    AYHAN HASSAN is the owner and controlling individual of nine restaurants with the names and addresses as follows:

    a.  Ayhan's Shish Kebab Mediterranean Restaurant has five locations:

        i.  550 SUNRISE HIGHWAY, BALDWIN, NY 11510;

        ii.  132 MIDDLE NECK ROAD, GREAT NECK, NY 11024;

        iii.  283 MAIN ST., PORT WASHINGTON, NY 11050

        iv.  379 S. OYSTER BAY RD, PLAINVIEW, NY 11803; and

1

      v.  477 OLD COUNTRY ROAD, WESTBURY, NY 11510;

  b.  Ayhan's Mediterranean Marketplace and Café has one location at 293 MAIN ST.
PORT WASHINGTON, NY 11050;

  c.  Ayhan's Fish Kebab Restaurant has one location at 286 MAIN ST., PORT
WASHINGTON, NY 11050;

  d.  Ayhan's Pita Express has two locations:

      i.  201 SUNRISE HIGHWAY, ROCKVILLE CENTRE, NY 11570; and

      ii.  399 NEWBRIDGE ROAD, EAST MEADOW, NY 11554.

Each of the nine restaurants listed above is collectively referred to as "Ayhan Restaurants." To the best of my knowledge and based on my personal observation, AYHAN HASSAN and other Defendants operate the nine restaurants as a common enterprise and each of the Ayhan Restaurants share common ownership and management. I observed that, frequently, employees from one restaurant were transferred to others to work. Based on my own conversations with other employees transferred to the restaurant where I worked, I was informed that Defendants instituted the same tip compensation policy to all tipped employees at each of the nine restaurants owned and operated by them.

    3.    During my employment for Defendants, I was not paid the statutory minimum wage. In addition, I personally observed, and was informed by tipped employees working at other Ayhan Restaurants, that it is Defendants' policy to pay below the statutory minimum wage rate to all tipped employees at all Ayhan Restaurants.

    4.    While I was employed with Defendants as a waitress, I had a regular weekly work schedule that fluctuated from between 4 to 6 days per week. On weekdays I would work 4:00 P.M. to 10:00 P.M. and on weekends 4:00 P.M. to 11:00 P.M. At least once per week I was

required to stay an additional 1-2 hours. Based on my personal observation, other tipped employees at the Ayhan Restaurant were also required to work for the same or similar hours.

5.      During my employment with Defendants, I was orally informed my base hourly rate was $4.00 per hour, however my paystubs incorrectly listed a base hourly rate of $5.00 per hour. Other tipped employees at the Ayhan Restaurants were also compensated at the base hourly rates below the prevailing minimum wage during the relevant employment periods, and also routinely worked for more than ten hours per day.

6.      While I was employed with Defendants, I received an hourly rate of $7.50 for my overtime hours, which was improperly calculated by multiplying $5 by time and a half. Other tipped employees, including but not limited to the tipped employees named in Paragraph 1 herein, similarly worked in excess of 40 hours per week and were paid similar incorrect rates for the relevant time periods.

7.      During my employment with Defendants, despite routinely working more than ten hours in a day, I was never paid a spread-of-hours premium. No other employee at any of the Ayhan Restaurants ever received a spread-of-hours premium.

8.      I was never given any notice that my employer was taking a tip credit, nor was I given notice of the tipped credit minimum wage or my proper overtime rate. I observed that no other tipped employee was given such notice. I was informed by tipped employees at other Ayhan Restaurants that they did not receive any proper notices either.

9.      During my employment with Defendants, it was the practice for Defendants to "pool" tips received and divide them among tipped employees. Employees were arbitrarily assigned a tip percentage at the discretion of managers designated by Defendants and employees

3

did not have the right to challenge their allocated tip percentage. The tip pooling schemes at all Ayhan Restaurants were controlled by Defendants and were not agreed to by tipped employees.

10.     Defendants failed to keep track of the daily amount of tips earned by tipped employees at each of the Ayhan Restaurants.

11.     Based on my observations and conversations with other employees, all tipped employees employed at the Ayhan Restaurants were required to engage in non-tipped activities for more than 20% of their daily working time, or at least two hours per shift, such as cleaning the restaurant and other non-tip related activities.

12.     Defendants claimed a meal credit for all employees working at the Ayhan Restaurants, but no employee was ever given notice by Defendants that Defendants were claiming a meal credit. Defendants also failed to notify all employees employed at the Ayhan Restaurants of the amount of meal credit allowance for each pay period. Specifically, Defendant HASSAN prohibited me from eating the employee meal but took a meal deduction from my wages.

13.     I have never received a wage and hour notice as required under New York State law. I personally observed that no employee employed by Defendants ever received any written wage and hour notice, either at the beginning of their employment, nor annually thereafter, informing them of their rate of pay, among other requirements of the New York Labor Law. I was informed that employees at other Ayhan Restaurants similarly did not receive a proper wage and hour notice.

14.     I personally observed that all employees employed at the Ayhan Restaurants received the same form of wage statements. I was informed by my counsel that such wage statements do not satisfy New York State law. Tipped employees at the Ayhan Restaurants also

4

never received in their wage statements the amount of tip credit allowance taken for each pay period with respect to their compensation. In addition, wage statements also did not reflect the off-the-clock hours the employees were required to work at the Ayhan Restaurants.

15.    I agree to act as a class representative and am of sound mind and body.

16.    I do not have any conflicts with prospective class members.

[REST OF PAGE LEFT INTENTIONALLY BLANK]

I affirm, under penalty of perjury, that the above and foregoing information is true and correct.

Dated: _____ 4-18 _____ , 2014

_____
JESSICA CAMARDA

STATE OF NEW YORK      )
                       ) SS:
COUNTY OF NEW YORK     )

SWORN AND SUBSCRIBED before me this __18th__ day of __April__, 2014.

_____
NOTARY PUBLIC, STATE OF NEW YORK

ANNE SEELIG-SUHRCKE
Notary Public, State of New York
No. 02SE6113610
Qualified in New York County
Commission Expires 08-02-2016

6

# Exhibit B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
MIGUEL ANGEL CORONEL MARTINEZ and
JESSICA CAMARDA, on behalf of themselves,
FLSA Collective Plaintiffs, and the Class,

                          Plaintiffs,

                  -against-

AYKEN, INC. d/b/a AYHAN'S FISH KEBAB;
AYHAN'S SHISH-KEBAB OF BALDWIN, INC.;
D/b/a AYHAN'S MEDITERRANEAN RESTAURANT;
SHISH KEBAB SNACK BAR, INC. d/b/a AYHAN'S
MEDITERRANEAN RESTAURANT; AYHAN'S
SHISH-KEBAB INTERNATIONAL CORP. d/b/a
AYHAN'S MEDITERRANEAN RESTAURANT; GREAT
NECK ASK, INC. d/b/a/ AYHAN'S MEDITERRANEAN
RESTAURANT; CYPRUS GRILL, LLC d/b/a
AYHAN'S MEDITERRANEAN RESTAURANT; 293
MEDITERRANEAN MARKET CORP. d/b/a AYHAN'S
MEDITERRANEAN MARKETPLACE AND CAFE;
AYHAND'S SHISH-KEBAB RESTAURANTS OF
ROCKVILLE CENTRE, INC. d/b/a/ AYHAN'S PITA
EXPRESS; AYHAN'S SHISH-KEBAB EXPRESS, INC.,
d/b/a AYHAN'S PITA EXPRESS; and AYHAN HASSAN,
                         Defendants.
------------------------------------------------X

                    30 East 39th Street
                    New York, New York

                    October 21, 2014
                    11:09 A.M.

9

JESSICA CAMARDA

2     Q     -- had you previous experience
3  working in a restaurant?

4     A     No.  That was my first job.

5     Q     First job period?

6     A     Well, after the birth of my son.  I
7  went back to work when my daughter was two, so
8  yeah.

9     Q     So tell me, how did you learn about
10  the job at Ayhan's?

11     A     I lived in Westbury at that time, and
12  it was local and easy for me to get to and from
13  work with the kids.  I went in, applied and that's
14  it.  Yeah.

15     Q     Which Ayhan's restaurant?

16     A     Trodos.

17     Q     That's the one across the street from
18  the Fortunoff mall; right?

19     A     Yes.

20     Q     So, did you know that they were
21  hiring people or looking for people when you
22  applied?

23     A     I didn't.  I just kind of went on a
24  whim.  I just walked in.

25     Q     Did you speak to anyone after you

12

JESSICA CAMARDA

1

2    I can't answer that.  I believe we discussed that

3    further down the line.  It was more or less my

4    applying for the job.  It wasn't said then.

5         Q     Was anything said about the rate of

6    pay?

7         A     I'm sorry?

8         Q     Was anything said about the rate of

9    pay?

10        A     No.  I was told verbally it would be

11   $4 an hour, and that's it.

12        Q     Was anything said about tips?

13        A     No.

14        Q     Did you have any understanding about

15   tips?

16        A     No.  My understanding personally was

17   that we would make money off tips from our

18   customers, but not a set rate, no.

19        Q     Was there any discussion as to what

20   servers can expect to make or what they can hope

21   to make on tips?

22        A     No.

23              MR. LEE:  Off the record for a

24              second.

25              (At this time, a brief recess

13

```
 1              JESSICA CAMARDA
 2         was taken.)
 3              MR. LEE:  For the record, we
 4         wanted to withdraw the invalid
 5         pooling claim for the tips for
 6         Miss Camarda.
 7  CONTINUED EXAMINATION
 8  BY MR. GRINGER:
 9         Q    Did you have any understanding how
10  much you could get in tips?
11         A    No.
12         Q    At the time you applied for the job,
13  did you have an understanding of what the minimum
14  wage was at that time?
15         A    No.
16         Q    Did you have any understanding that
17  you got paid less than the standard minimum wage
18  because you got tips?
19         A    No.
20         Q    After you spoke to Ayhan, how much
21  time elapsed before you learned that you were
22  hired?
23         A    Right away.  Yeah, right away.
24         Q    Did Ayhan tell you you were hired?
25         A    They both did.  We'll be fair.  They
```

JESSICA CAMARDA

1

2          Q       Were you told what time to report for

3    work?

4          A       Yes.

5          Q       Who told you what time to report for

6    work?

7          A       They both did, both Ayhan and the

8    manager.

9          Q       What time did they tell you to report

10   for work?

11         A       I was on at 4 p.m.

12         Q       4 p.m.?

13         A       Yes.

14         Q       Were you always on the night shift?

15         A       Always.  Excuse me.  I'm sorry.

16   Sundays I did the morning.  I opened.

17         Q       Now, when you worked the night shift,

18   until what time did you work?

19         A       Varied.  Anywhere from 4 to 10 or 4

20   to 11.

21         Q       Whether you worked until 10 or 11,

22   what did that depend on?

23         A       Well, we stayed extra because we had

24   side work.  We stayed to clean.  There was extra

25   work that we had to do.

16

JESSICA CAMARDA

Q    How often did that happen?

A    Every day, every night.

Q    So did you always stay until 11?

A    Always.

Q    Were there times that you stayed only until 10?

A    Well, let me rephrase that.  10 would be like the weekdays, but the weekends are later, the hours.  So 11 is weekends, yes.

Q    So typically, weekdays you would stay until 10, and weekends you stay until 11?

A    I mean it changed.  There were times I was there at 11, but yes.

Q    Now, when you reported to work at the restaurant Trodos, was there anything that you had to do to record the time that you arrived to work?

A    Oh, yeah.

Q    What did you do?

A    We had to sign in, punch in on the computer.

Q    When you left, did you punch out on the computer?

A    Yes.

Q    Did you make any entries on the

17

JESSICA CAMARDA

1
2  computer during the course of the day?
3         A      I'm sorry?
4         Q      Did you punch in or out during the
5  day?
6         A      No.
7         Q      Just in and out?
8         A      Yup.
9         Q      It was one punch in, one punch out
10 every day?
11        A      Exactly.
12        Q      What day of the week did you get
13 paid?
14        A      I'm sorry.  I don't know that.  I
15 don't.
16        Q      Did you get paid once a week?
17        A      It was biweekly.
18        Q      Every other week?
19        A      Mm-hmm.
20        Q      When you got your first paycheck, did
21 you look at it?
22        A      I did.  But again, it was my first
23 job, and I don't know everything.  So I just -- it
24 was money.  I have kids to support.  I just -- you
25 know, I cashed it in and paid my bills.

1                    JESSICA CAMARDA
2    That I complained about.
3         Q    When was the first time that you
4    noticed that?
5         A    Again, I don't have a date, to be
6    fair.
7         Q    Who did you see doing that?
8         A    Emin.
9         Q    Who is Emin?
10        A    Emin is the manager in the
11   restaurant.
12        Q    That's not Mr. Cerritos, that's
13   someone else?
14        A    No.  It's not Mr. Cerritos, no.
15        Q    Was Mr. Cerritos a manager at the
16   restaurant?
17        A    Yes.
18        Q    And Mr. Emin was another manager?
19        A    Yeah.  He took over.
20        Q    He replaced Mr. Cerritos?
21        A    Mm-hmm.
22        Q    How long had you worked at the
23   restaurant before Mr. Emin took over?
24        A    Again, I'm assuming, I'm not
25   accurate, I will say four months.  I could be

20

JESSICA CAMARDA

2  wrong.

3       Q     Did you ever see Mr. Cerritos punch

4  you out while you were working?

5       A     No.  I feel like this started when

6  Emin took over.  We had no problems until --

7       Q     Is Emin his first name or last name?

8       A     It's his first.  E-M-I-N.

9       Q     Do you know his last name?

10      A     No, I don't.

11      Q     Now, how many times did you observe

12  Emin punch you out while you were working?

13      A     A lot.  We'll say like twice a week

14  maybe, to be fair.

15      Q     Okay.  And how many times did you

16  observe him do this before you brought up the

17  issue and the complaint?

18      A     Not much.  I brought it up

19  immediately, so maybe once.

20      Q     All right.  So when you complained,

21  who did you complain to?

22      A     Ayhan.

23      Q     Ayhan?

24      A     Yes.

25      Q     Was this in person?

24

                        JESSICA CAMARDA

1

2        A      Right.

3        Q      What did Ayhan say?

4        A      He would handle it.

5        Q      Is that all he said?

6        A      Yes.  Yes, it is.

7        Q      You said earlier Ayhan said I don't

8   think he's trying to single you out.

9        A      With the punching out.  But I also

10  then mentioned it can't be me being singled out,

11  because it's also my weight, it's the food, it's

12  the cutting of the hours.  So, you know, there's

13  more than one thing here.

14       Q      Now, you said you were working at the

15  restaurant --

16       A      Mm-hmm.

17       Q      -- for four months before Emin became

18  the manager.

19       A      Yeah, about.  Yeah.

20       Q      What were your hours before Emin

21  became the manager?

22       A      Full time hours.  4 to 9, 4 to 10,

23  six days a week at most.

24       Q      Typically, which days of the week did

25  you work?

25

JESSICA CAMARDA

1

2    A    All of them.  I worked weekends and
3    weekdays.  I mean one day of the week I didn't
4    work really.

5    Q    You would have one day off?

6    A    Yeah.  I was working full time.

7    Q    So typically you were working.  Did
8    you have a set day off?

9    A    No.  At the time, no.  No, we did
10   not.  No one did.

11   Q    Typically you were working six days a
12   week?

13   A    Right.

14   Q    And you would work the weekdays?

15   A    And weekends.

16   Q    The weekdays, I think you testified
17   earlier, you said you worked from 4 to 10?

18   A    Yeah.  Right.  It was the weekends
19   that were longer.

20   Q    I heard you say sometimes you worked
21   4 to 9; is that correct?

22   A    Anywhere from 4 to 9 to 4 to 11,
23   because we had to do side work.

24   Q    Would it be fair to say when you
25   worked 4 to 9, it would only be on a weekday?

26

JESSICA CAMARDA

1

2      A      Yeah, only because the weekends were

3  open later.

4      Q      What, if anything, determined whether

5  you worked 4 to 9 or 4 to 10 on a weekday?

6      A      I'm sorry.  I missed that.

7      Q      What, if anything, would cause you to

8  work 4 to 9 as opposed to 4 to 10 on a weekday?

9      A      The work that we had to do.

10     Q      Okay.  So if things weren't busy, you

11 could go home earlier?

12     A      No.  Whether they were busy or not,

13 we were forced to stay to do the work, like

14 cleaning, labor work.

15     Q      Sometimes you left at 9 and sometimes

16 you left at 10?

17     A      Being fair, yeah, rarely.  But there

18 were times, yes.

19     Q      It wasn't the usual thing to leave at

20 9?

21     A      No.

22     Q      Just once in a while?

23     A      It wasn't the usual to leave at 9.

24 Only a few times we left at 9.

25     Q      What would permit someone to leave at

JESSICA CAMARDA

1

2    9 instead of 10?

3         A     If I got it done ahead of time.

4         Q     If you finished, you could go

5    earlier?

6         A     Yeah.  Basically I had to work while

7    working.  I had to serve and do the cleaning up.

8         Q     Typically, what was the routine?  You

9    would come in at 4.  What would be the first thing

10   you would do after you punch in?

11        A     Clean.

12        Q     What did you clean?

13        A     Side work.  Whatever had to be done.

14   It was a mess.  I had to.

15        Q     Tell us what side work is.  Tell us

16   what you had to clean.

17        A     Side work is typically wiping down

18   counters, cleaning out the frig, organizing.

19   What's the word?  Like stocking, things of the

20   sort.

21              Instead it became you have to mop the

22   floors, you have to pull out chairs and sweep, you

23   know.  And throughout the day, either someone

24   didn't do the job, it wasn't done, whatever, and I

25   had to do it.

36

JESSICA CAMARDA

1

2      A      Yeah.  He told me you can't eat.

3      Q      Period?

4      A      Yes, and then followed it with,

5  you're fat, you need to lose weight, you look like

6  shit.

7      Q      How many times did Ayhan tell you

8  that?

9      A      A few, but everyone -- he said that

10 in front of every single worker.  That was in

11 front of everyone.

12     Q      Now, you say your hours were cut.

13 When were they cut?

14     A      When Emin came.

15     Q      How were your hours cut?

16     A      It went from six days a week -- from

17 six to four days a week, to three to two days a

18 week.  Hours were cut as well.  I was working full

19 time, and I went to part time.

20     Q      So originally you were working six

21 days before Emin arrived, then four days and then

22 two days?

23     A      Anywhere from four to six days a week

24 is a full-time employee, and then down to three to

25 two days a week as part time, yeah.

                    JESSICA CAMARDA

1

2        Q      That was a set amount?

3        A      20 percent.

4        Q      To the busboys?

5        A      Yes.

6        Q      Were you required to share your tips

7   with anyone else?

8        A      A bartender on Saturdays, 10 percent.

9        Q      Anyone else?

10       A      That's it.

11       Q      And this is on a daily basis; am I

12  correct?

13       A      Correct, yeah.  The bartender on

14  Saturdays and busboy every night, yeah.

15       Q      Were there ever issues from busboys

16  or a bartender that a waiter didn't share the tips

17  properly; did that ever come up?

18       A      I never heard that, no.  No.

19       Q      Now, when you worked on Sundays, what

20  hours did you work?

21       A      I open at I think it's 10, so 10 to

22  4.  I had go in early to set up on my own, just to

23  be like prepared, but that was the hours, yeah.

24       Q      Again, would it be basically the same

25  routine, the first hour you clean up, then you

47

JESSICA CAMARDA

1

2   management, but I already knew where I was at that

3   point, so I started to just stop.

4        Q      Did you ever get any explanation why

5   you got a lesser amount?

6        A      No.  That's why I didn't mention it.

7   There was too much going on.  It was like one

8   thing after another.  What's the point?  They're

9   not going to admit it.

10       Q      Can you give me an example of how big

11  the difference might have been?

12       A      A couple of dollars, but from each

13  receipt, so it adds up.  Just a few dollars.

14       Q      How many times would you say this

15  happened?

16       A      Well, it happened a lot.  How many

17  times since working?  Maybe 20 the whole time I

18  worked there.

19       Q      When the manager punched you out,

20  what period of time was he doing this punching out

21  for you?

22       A      It depended on if we were busy.  If

23  we weren't busy, we did it.

24       Q      There were times he punched you out

25  while you were working?

```
1                      JESSICA CAMARDA

2        A      Absolutely.

3        Q      How many times has that happened?

4        A      A handful of times.  10.

5        Q      10 times?

6        A      10 times.

7        Q      Did you ever have an explanation why

8   he did that?

9        A      No.  I don't have an explanation for

10  anything for him, nothing.

11       Q      Did you ever confront him about that?

12       A      No.  No.  At that point I didn't

13  mention the money, because I had already mentioned

14  everything else occurring, so I just shut my

15  mouth.

16              MR. LEE:  I want to break in for

17              a second.  We can continue, but I

18              just want to clarify the stipulation

19              earlier that I had put on the record.

20                 The stipulation I just want to

21              clarify is really for Miss Camarda in

22              regards to the tip pooling.  She

23              didn't pool tips with other servers,

24              but she did pool tips with the

25              busboys and the other people listed.
```

49

```
 1                    JESSICA CAMARDA
 2              So if you want to ask her
 3         questions about tip pooling with
 4         respect to other people, you should
 5         go ahead and do that.
 6              MR. GRINGER:  Okay.  Thanks.
 7              MR. LEE:  Why don't we take a
 8         break anyway.
 9              (At this time, a brief recess
10         was taken.)
11  CONTINUED EXAMINATION
12  BY MR. GRINGER:
13       Q    Did you ever check your paystub to
14  see how many hours they were paying you for?
15       A    Yes.  But did I understand it, no.
16  It was my first job.  I didn't even know it said
17  at first the five an hour when he said verbally
18  four.  Like I mean call me stupid, but I didn't
19  know.
20       Q    Let me ask you another question.
21            You said originally when you
22  interviewed, $4 an hour, and the paystub said $5
23  an hour.
24       A    Yeah.  It does say that.
25       Q    Do you know in realty whether you
```

50

JESSICA CAMARDA

1
2  were paid $4 or $5?

3      A    Now I know I was paid 4.  I know I
4  was paid 4.

5      Q    You were not paid 5?

6      A    No, I was not.

7      Q    When you do the arithmetic and you
8  take the number of hours and you multiply it by
9  five --

10     A    Yes.  I know I'm underpaid.  While
11 working there, I did not know what was happening.

12     Q    How do you know that you were paid
13 four and not five?

14     A    Legally I found out.  I spoke with my
15 lawyer, and we went through it together.

16     Q    You don't have to say any more about
17 that.

18          Now, when you lost weight, who was it
19 who said you have to buy new clothes?

20     A    Ayhan.

21     Q    Ayhan said that.  Okay.

22          Now, did you ever work in any of the
23 other Ayhan restaurants?

24     A    No.  I didn't, no.

25     Q    Do you know if any of the servers

```
1                    JESSICA CAMARDA
2    your attorney?
3         A    I did.  But I have my own records, I
4    believe.  I always -- you know just for
5    documentation, but yeah.  That's any job.
6         Q    Those were the only records you had,
7    were the paystubs?
8         A    That's it.
9         Q    Now, since the time that you became a
10   plaintiff in this action, have you spoken to any
11   of the other Ayhan workers about this lawsuit?
12        A    Well, in a way, because we all -- I
13   figured this out because of the workers, so yeah.
14   I mean we haven't discussed the case, no, but I
15   found out about what was going on because we all
16   spoke about it.
17             If they hadn't come to me, I wouldn't
18   have known it happened to them.  They don't know
19   anything about my case.  That's my business.
20        Q    Have you asked anyone to be a witness
21   for you in this case?
22        A    No.
23        Q    Who was Melinda Lee?
24        A    Melinda was working with me at the
25   time, but became a manager while this occurred.
```

69

                    JESSICA CAMARDA

1

2       Q       And was she a server?

3       A       At first.

4       Q       Did you ever have any conversations

5  with her about her rate of pay and her amount of

6  her tips, or the hours that she worked?

7       A       Before this started, we all talked

8  about it, yeah.

9       Q       And she was one of them?

10      A       Yeah.

11      Q       What, if anything, did she have to

12  say about her rate of pay, or her hours, or her

13  tips?

14      A       Hours, we all felt we were being cut.

15  That's why she left.

16              But the rate of pay, we figured out

17  we weren't getting the right amount.  We all

18  figured that out.  It took a bunch of us to

19  realize we were all underpaid.

20      Q       That you were getting $4 instead of

21  $5?

22      A       All of us, right.

23      Q       And she told you that?

24      A       Yes.

25      Q       And her hours were cut as well as

JESSICA CAMARDA

1

2    your hours were cut?

3         A     Yeah.  She left, yeah.

4         Q     Did she ever tell you that Emin

5    punched her out while she was working?

6         A     She didn't tell me that, no.

7         Q     Who is Melissa Missone?  (Phonetic)

8         A     Missone.  She was also a server

9    there.

10        Q     What, if anything, did she tell you

11   about her hours, or her rate of pay, or her tips?

12        A     The same thing.  All we discussed was

13   the group, everyone on there.  We are the ones who

14   came forward and were like wait a minute.  We were

15   underpaid.  Kind of all I know.

16        Q     Did she tell you that Emin had

17   punched her out while she was working?

18        A     No.

19        Q     But her hours had been cut as well?

20        A     I believe so.  I don't know if she

21   picked up my hours at first, but she got the same

22   treatment in the end, because she left.

23        Q     Do you know if she worked over 40

24   hours in a week?

25        A     She worked hard.  She was there a

JESSICA CAMARDA

1

2    lot.

3         Q     Do you know if she got time and a

4    half for work over 40 hours?

5         A     I don't think she did.  I can't,

6    like, say it for her.  Like when we discussed

7    this, she was the one who was like none of us got

8    the right amount.

9         Q     Do you know if Melinda Lee worked

10   over 40 hours?

11        A     I don't.  I don't know that.

12        Q     Did you ever talk to any of the

13   workers who worked at the other Ayhan restaurants

14   other than Trodos?

15        A     Yes, I did.

16        Q     Who was that?

17        A     The people I listed.  Diana was one

18   of them, Juan.  Whoever I ran into.  All we

19   discussed again was -- they're kind of the ones

20   who mentioned it, and that's when we got together,

21   because we worked together.  They said the same

22   thing.  I'm being underpaid.  I'm being

23   mistreated.  I kind of realized we're all being

24   mistreated.  In a way, I'm here for everybody.

25        Q     Did Diana ever tell you that she

JESSICA CAMARDA

1

2    worked over 40 hours a week and didn't get time

3    and a half?

4           A      She didn't say that.

5           Q      Did she ever tell you that she was

6    being paid $4 an hour instead of $5 an hour?

7           A      At the end, yes.  Not at first.

8           Q      Eventually she told you that?

9           A      Exactly.  None of us knew until

10   later, yeah.

11          Q      Did she ever tell you that her

12   manager punched her out while she was still

13   working?

14          A      No, she didn't say that.

15          Q      Did you ever work more than 10 hours

16   in a day?

17          A      Yes.  There were times that I was

18   there all day, like a Sunday.  Sometimes I do

19   brunch and then I stay for the night shift, so

20   yes.

21          Q      How many times did that happen?

22          A      Seven.  I don't have a number.  I'm

23   assuming.  I mean it came up like it wasn't

24   planned.

25          Q      Were there any times or any days when

JESSICA CAMARDA

1
2   there?

3        A    It looks like -- yes, it does, but I

4   really don't recall.  Maybe they gave it to me in

5   the store.  I don't recall getting this in the

6   mail or seeing them after this.

7        Q    Now, item 1 says there was

8   intentionally overcharging of tips to our

9   customers 13 times dating back to August, 21.

10         Now, you talked about the tip issue

11   from the day before, the night before.  Had that

12   issue ever been brought up with you previously?

13        A    Well, I'm gonna stop you there,

14   because I was employed December, 2011.

15        Q    December?

16        A    December.  So it's not even accurate.

17        Q    That's when you were hired?

18        A    Yup, and I was terminated May, 2012.

19        Q    May, 2012?

20        A    Mm-hmm, is my termination.  But I

21   wasn't even working there in August.  Of course I

22   argued with management because -- well, we'll talk

23   about that in a minute.

24        Q    Let me show you Exhibit 2 again.  The

25   employment application is dated January 17 --

# Exhibit C

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
MIGUEL ANGEL CORONEL MARTINEZ and
JESSICA CAMARDA, on behalf of themselves,
FLSA Collective Plaintiffs, and the Class,
                                    Plaintiffs,
            -against-                      Case No.
                                           CV13-7411
AYKEN, INC. d/b/a AYHAN'S FISH KEBAB; AYHAN'S
SHISH-KEBAB OF BALDWIN, INC. D/b/a AYHAN'S
MEDITERRANEAN RESTAURANT; SHISH KEBAB SNACK
BAR, INC. d/b/a AYHAN'S MEDITERRANEAN
RESTAURANT; AYHAN'S SHISH-KEBAB INTERNATIONAL
CORP. d/b/a AYHAN'S MEDITERRANEAN RESTAURANT;
GREAT NECK ASK, INC. d/b/a AYHAN'S
MEDITERRANEAN RESTAURANT; CYPRUS GRILL, LLC
d/b/a AYHAN'S MEDITERRANEAN RESTAURANT;
293 MEDITERRANEAN MARKET CORP. d/b/a AYHAN'S
MEDITERRANEAN MARKETPLACE AND CAFE; AYHAN'S
SHISH-KEBAB RESTAURANTS OF ROCKVILLE CENTRE,
INC. d/b/a AYHAN'S PITA EXPRESS; AYHAN'S
SHISH-KEBAB EXPRESS, INC. d/b/a AYHAN'S PITA
EXPRESS; and AYHAN HASSAN,
                                    Defendants.
-----------------------------------------------X
                     October 8, 2014
                     11:14 a.m.

                     30 East 39th Street
                     New York, New York


          DEPOSITION of MIGUEL ANGEL CORONEL

MARTINEZ, a Plaintiff herein, taken by the

Defendants, pursuant to Article 31 of the

Civil Practice Law and Rules of Testimony, and

Notice, held at the above-mentioned time and

place, before Kristi Cruz, a Notary Public of

the State of New York.

CERTIFIED
TRANSCRIPT

85

M. MARTINEZ

1

2                    (Recess was taken.)

3                    MR. GRINGER:   What was the

4          last question?

5                    (Record read.)

6    BY MR. GRINGER:

7          Q     Did the company provide a meal?

8          A     Yes, there was a meal.

9          Q     What did meal consist of,

10   typically?

11         A     Chicken, gyro, some shish-kebab,

12   salad, soup is.   That's it.

13         Q     Was there any --

14         A     Fries.   That's it.

15         Q     Was there a choice of what you

16   could eat, or was it a set menu?

17         A     Set menu.

18                   MR. LEE:   Wait for him to

19         finish and the translation.

20         Q     After 10:00, you cleaned up the

21   floor, mopped up, and put the chairs on the

22   tables?

23         A     We were all set to go home.

24         Q     How long would that take?

25         A     We had to try to do it as fast as

M. MARTINEZ

1
2    possible because we were tired and we wanted
3    to go.
4          Q       So the faster you did it, the
5    sooner you would go home?
6          A       That's correct.
7          Q       So how long would it take?
8          A       If there were two people doing it,
9    half an hour, maybe less.
10         Q       Who would do it besides you?
11         A       My coworker, the other busboy.
12         Q       The waiters never assisted in
13   cleaning up?  They never did sweeping,
14   mopping, putting the chairs on tables?
15         A       No.
16         Q       To your knowledge, did you ever
17   observe waiters helping in the kitchen,
18   preparing food or preparing salads or anything
19   like that?
20         A       No.
21         Q       Typically, how many kitchen
22   workers were there in the kitchen at any one
23   time?
24         A       Sometimes three, sometimes four,
25   sometimes seven.